## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESTATE OF JACK HERBERT PECHTER, by its Personal Representative, Shelly Pechter Himmelrich, <br><br> *Plaintiff,* <br><br> v. <br><br> FINANCIAL CREDIT INVESTMENT III SPV-B (CAYMAN), L.P.; <br><br> U.S. BANK, N.A.; <br><br> FINANCIAL CREDIT INVESTMENT III MANAGER, LLC; and <br><br> BERKSHIRE HATHAWAY LIFE INSURANCE COMPANY OF NEBRASKA, <br><br> *Defendants.* | Case No. 26-cv-4834 |

### COMPLAINT

Plaintiff, the Estate of Jack Herbert Pechter, by its personal representative, Shelly Pechter Himmelrich (the "Estate"), brings this complaint against Defendants, Financial Credit Investment III SPV-B (Cayman), L.P. ("FCI SPV-B"); U.S. Bank, N.A. ("U.S. Bank"); Financial Credit Investment III Manager, LLC ("FCI Manager"); and Berkshire Hathaway Life Insurance Company of Nebraska ("Berkshire Hathaway"), and in support thereof alleges as follows.

### INTRODUCTION

1. This action involves a $12.5 million life insurance policy (the "Policy") on the life of Jack Herbert Pechter.

2. The Policy was originated and procured by a family of interrelated Delaware entities known generally as Coventry. Because Coventry lacked an insurable interest in Mr. Pechter's life,

the Policy was a stranger-originated life insurance ("STOLI") policy that violated applicable Delaware law.

3.     After Mr. Pechter died in 2024, U.S. Bank, as the Policy's owner and beneficiary, claimed the death benefit from the insurer, and accordingly received the Policy's death benefit in the first instance. FCI SPV-B and Berkshire Hathaway received the Policy's death benefit thereafter. Under 18 *Del. C.* § 2704(b), the Estate is entitled to recover the Policy's death benefit from U.S. Bank, FCI SPV-B, and Berkshire Hathaway, jointly and severally, along with prejudgment interest. *See, e.g., Estate of Jayson v. U.S. Bank, N.A.*, 2025 WL 2955016, at *8–9 (Del. Super. Oct. 20, 2025) (rejecting U.S. Bank's argument that, because it was acting as an agent, or securities intermediary, for an entity that claimed to have a beneficial interest in a STOLI policy's death benefit, it was immune from liability under § 2704(b), and instead ruling that U.S. Bank and the other entity could be held jointly and severally liable under § 2704(b)); *Estate of Malkin v. Wells Fargo Bank, N.A., and Berkshire Hathaway Life Insurance Company of Nebraska*, 2022 WL 2285884, at *1–2 (11th Cir. June 23, 2022) (affirming district court's judgment holding liable under § 2704(b) both Wells Fargo, which received a STOLI policy's death benefit in the first instance, and Berkshire Hathaway, which received the death benefit thereafter, and recognizing that Wells Fargo and Berkshire Hathaway conceded that they could be held jointly liable).

4.     Moreover, FCI Manager and, to the extent that they are not held directly liable under § 2704(b), U.S. Bank and Berkshire Hathaway are liable for conspiring with FCI SPV-B to violate Delaware's prohibition on human-life wagering, and for aiding and abetting FCI SPV-B's violations of that prohibition.

**PARTIES**

5.      Jack Pechter was a citizen of Florida at the time of his death. Therefore, the Estate is a citizen of Florida. Shelly Pechter Himmelrich, Mr. Pechter's daughter, has been appointed as the Estate's personal representative.

6.      FCI SPV-B is a limited partnership formed under the laws of the Cayman Islands. According to its disclosures in actions similar to this one, FCI SPV-B is jointly owned by Defendant Berkshire Hathaway and by Financial Credit Investment III Designated Activity Company ("FCI Ireland"). Berkshire Hathaway is a capital stock life insurance company incorporated under the laws of Nebraska and having its principal place of business in Nebraska. FCI Ireland is a private limited company incorporated under the laws of Ireland. For the foregoing reasons, FCI SPV-B is a citizen of Nebraska and Ireland, and Berkshire Hathaway is a citizen of Nebraska.

7.      FCI Manager is a limited liability company formed under the laws of Delaware and is a subsidiary of Apollo Global Management, Inc., a Delaware corporation with its principal place of business in New York. Therefore, FCI Manager is a citizen of Delaware and New York.

8.      U.S. Bank is a national bank with its main office in Ohio. Therefore, it is a citizen of Ohio.

**JURISDICTION AND VENUE**

9.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and because there is complete diversity between the Estate and the Defendants.

10.      This Court has personal jurisdiction over the Defendants, and venue is proper in this District, for a number of reasons.

11.      At all times relevant to the claims asserted here, FCI SPV-B was managed and operated, directly or indirectly, by FCI Manager, whose headquarters are in Manhattan and whose

employees work in Manhattan. As is set forth below, FCI Manager engaged in various activities with respect to the Policy, and in so doing acted for the benefit of, with the knowledge and consent of, and under some control by, FCI SPV-B or its agents.

12.    FCI Manager also served as the investment manager for FCI SPV-B's parent and majority owner, FCI Ireland. In or around 2017, FCI Manager advised FCI Ireland, directly or through an agent, to acquire beneficial interests in various life insurance policies, including the Policy, from Lavastone Capital LLC (f/k/a AIG Life Settlements LLC) ("AIG"), which had its principal place of business in New York.

13.    Later in 2017, after FCI Ireland acquired beneficial interests in those policies, FCI Manager advised FCI SPV-B, directly or through an agent, to acquire beneficial interests in some of those policies, including the Policy, from FCI Ireland. Toward that end, FCI Manager advised both FCI SPV-B and FCI Ireland to execute an Omnibus Assignment, Assumption, and Release Agreement, dated November 13, 2017 and subject to a New York choice-of-law clause, by which that acquisition was accomplished. FCI Manager also advised FCI SPV-B to engage New York counsel—in particular, Paul, Weiss, Rifkind, Wharton & Garrison LLP—to represent it in that transaction, and, as is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, communicated and interacted with Paul, Weiss on FCI SPV-B's behalf.

14.    During the three years when FCI SPV-B held a beneficial interest in the Policy, FCI Manager regularly conducted valuations of the Policy; on the basis of those valuations advised FCI SPV-B, or persons acting on its behalf, to keep the Policy in effect and to continue to pay the Policy's premiums; determined the optimal amounts and dates of those premium payments; monitored the Policy and ensured that premiums were being paid in the amounts and on the dates that were deemed

4

optimal; and communicated with and worked with FCI Ireland's personnel about the Policy and other policies.

15.     In addition to the foregoing, by virtue of the aforementioned November 13, 2017 Omnibus Assignment, Assumption, and Release Agreement, FCI SPV-B assumed the rights and obligations of FCI Ireland under the July 31, 2017 Securities Account Agreement between FCI Ireland and U.S. Bank, including U.S. Bank's obligation to act as an agent, or securities intermediary, with respect to the Policy and other policies. The Securities Account Agreement was subject to a choice-of-law clause selecting New York law and a forum-selection clause selecting this District as well as state courts sitting in New York City. Moreover, the Securities Account Agreement made the securities intermediary's jurisdiction New York for purposes of the Uniform Commercial Code.[1]

16.     U.S. Bank also entered into a series of agreements in 2006 with New York-based AIG for the purpose of facilitating AIG's acquisition of STOLI policies, including the Policy here. Through those agreements, U.S. Bank undertook various duties and responsibilities, as further described below. Moreover, between 2008 and 2017, U.S. Bank acted as AIG's agent, or securities intermediary, with respect to the Policy. Pursuant to its obligations as AIG's securities intermediary, U.S. Bank served as the Policy's owner and beneficiary, and regularly interacted with the insurance company, and with AIG in New York, in connection with the Policy. Fee agreements entered into with AIG in New York—and executed, on behalf of U.S. Bank, by a U.S. Bank executive in New York—set forth in detail the various services that U.S. Bank provided to AIG in New York in

---

[1] That provision has no effect on the applicability of Delaware law to the Estate's claims because, *inter alia*, the Estate was not a party to the Securities Account Agreement; the Estate's claims are not based on that agreement; and the Policy was issued for delivery to, and was actually delivered to, a Delaware statutory trust. *See* 18 *Del. C.* § 2704(e)(4), (g).

connection with the Policy, including U.S. Bank's services as titling trustee, as securities intermediary for the titling trust holding the beneficial interest in the Policy, and as fiscal agent.

17.    FCI SPV-B was established to allow Berkshire Hathaway and FCI Ireland to acquire and jointly invest in STOLI policies, including the Policy here. As is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, Berkshire Hathaway was involved in the formation of FCI SPV-B, including in working with FCI Manager in that connection. As is also likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, FCI Manager acted for the benefit of, with the knowledge and consent of, and under some control by, Berkshire Hathaway or its agents.

## FACTUAL BACKGROUND

### The Coventry Program and U.S. Bank's Involvement in the Program

18.    In the early 2000s, Coventry[2] began originating STOLI policies through transactions that were nominally structured as non-recourse loans to spurious Delaware trusts but that were designed from the outset to place policies in the hands of strangers who had no insurable interest in the insured's life. Under that arrangement, third-party investors would pay all of the policy's premiums, and after approximately two years the policy would either be relinquished to the purported lender in lieu of repaying the supposed loan or else sold on the secondary market.

19.    U.S. Bank was involved in Coventry's program from the outset. *See generally Sun Life v. U.S. Bank, N.A.*, 369 F. Supp. 3d 601, 616 (D. Del. 2019) ("Coventry, with the help of U.S. Bank, established and directed a program to increase the number of high-value life insurance policies available on the secondary market."). In 2001, U.S. Bank entered into a "Life Settlement Policies

---

[2] "Coventry" includes the following Delaware entities: Coventry First, LLC (f/k/a Montgomery Capital LLC); Coventry Capital I, LLC; Coventry Servicing, LLC; PFP Partners LP; PFP Funding I, LLC; PFP Funding II, LLC; and CHC Financial, LLC.

Origination Agreement" with a Coventry entity and with an AIG-affiliated trust whereby (i) the Coventry entity agreed to originate life insurance policies; (ii) the trust agreed to purchase the policies (or beneficial interests in the policies), provided that they met certain criteria; and (iii) U.S. Bank agreed to facilitate those purchase transactions in multiple respects, including by evaluating the propriety of each prospective sale, by assisting with the financial mechanics of each transaction, and by establishing and serving as the trustee of a Delaware statutory trust (the "Titling Trust") that would hold beneficial interests in the policies for the benefit of the AIG-affiliated trust.

20.    In 2006, U.S. Bank entered into a similar "Life Policies Origination Agreement" with Coventry and with AIG, which was to replace the AIG-affiliated trust as the prospective purchaser of Coventry-originated policies. Under that agreement, U.S. Bank agreed to facilitate the purchase transactions in substantially the same ways as in the earlier agreement, with the object of causing beneficial interests in the policies to be acquired by AIG.

21.    Under the foregoing agreements, and under related agreements, U.S. Bank assumed various roles in connection with its duties and responsibilities, including the role of trustee of the AIG-affiliated trust that was the purchaser under the 2001 agreement, the role of fiscal agent for AIG, the roles of owner and beneficiary of the life insurance policies that were to be originated and sold under the program, and the roles of custodian, escrow agent, securities intermediary, and paying agent for various entities involved in the transactions.

### The Procurement of the Policy

22.    In or around 2005, Coventry, through its agents, identified Mr. Pechter, who was then in his early seventies, as a prospective insured under the program and began the process of originating the Policy.

23. In late 2005 or early 2006, Coventry, through its agents, submitted to Hartford Life and Annuity Insurance Company ("Hartford") an application for a universal life insurance policy on Mr. Pechter's life.

24. The application identified the owner and beneficiary of the proposed policy as the Jack Pechter 2005 Insurance Trust (the "Trust"), which was a Delaware statutory trust established by Coventry. The application described the trustee of the Trust as Wilmington Trust Company, located at 1100 North Market Street, Wilmington, DE 19890.

25. The Trust was not created for a legitimate purpose but was instead created by Coventry and/or its agents as a means of causing Hartford to believe, incorrectly, that the Policy's actual beneficiaries would be members of Mr. Pechter's family or that it otherwise served a legitimate insurance purpose.

26. The application was signed on behalf of the Trust in Wilmington, Delaware, by an assistant vice president for Wilmington Trust Company, which served as trustee of the Trust, the Policy's initial owner and beneficiary.

27. After receiving the application, Hartford issued the Policy for delivery to the Trust in Delaware. The Policy was numbered VL9349279 and provided $12.5 million in coverage.

28. Hartford received a delivery receipt for the Policy executed in January 2006 in Wilmington, Delaware, by a senior financial services officer for the Trust's trustee, Wilmington Trust Company, acknowledging that the Policy had been delivered to and received by the Trust in Wilmington, Delaware.

29. The Policy lacked an insurable interest at its inception and was procured on Mr. Pechter's life as part of a STOLI scheme in violation of Delaware's Constitution, common law, insurable interest statute, and public policy. Any appearance of a valid insurable interest was false.

Neither Mr. Pechter nor any member of his family ever paid, or was obligated to pay, any premiums for the Policy. Instead, the premiums were paid by investors who lacked an insurable interest in Mr. Pechter's life.

### The Sale of the Policy and the Collection of Its Death Benefit

30.     In July 2008, Coventry purchased the Policy from the Trust, and thereafter engaged U.S. Bank to be the Policy's legal owner and beneficiary—that is, the entity that would be listed in Hartford's books and records as the Policy's legal owner and beneficiary; that would be the Policy's owner and beneficiary under the contractual terms of the Policy; and that would have all rights under the insurance contract, including the right to claim and receive the Policy's death benefit.

31.     U.S. Bank became the Policy's legal owner and beneficiary through a Transfer of Ownership form and a Change of Beneficiary form, both jointly executed by the Trust and U.S. Bank, and then submitted to Hartford. The Transfer of Ownership form stated: "The undersigned Current Policyowner [i.e., the Trust] hereby absolutely transfers and assigns all rights, title, and interest in the above Policy to the Undersigned New Policyowner [i.e., U.S. Bank]." The Change of Beneficiary form designated U.S. Bank as the Policy's sole beneficiary. Shortly after receiving those forms, Hartford confirmed in writing that U.S. Bank was the Policy's owner and sole beneficiary.

32.     In the Transfer of Ownership and Change of Beneficiary forms, and in Hartford's records, U.S. Bank was styled as "U.S. Bank, N.A., as Securities Intermediary." However, there is no actual legal entity by the name "U.S. Bank, N.A., as Securities Intermediary." The relevant legal entity is simply "U.S. Bank, N.A." The reason why U.S. Bank appeared in Hartford's records under the designation "U.S. Bank, N.A., as Securities Intermediary" is that U.S. Bank's customers—in particular, Coventry, AIG, FCI Ireland, and FCI SPV-B—required U.S. Bank to identify itself to

9

Hartford under that designation. Hartford was never told, and did not know, the identity of any of U.S. Bank's customers.

33.    Shortly after Hartford confirmed U.S. Bank's status as the Policy's legal owner and beneficiary, Coventry transferred the beneficial interest in the Policy to AIG. U.S. Bank continued to serve as the Policy's legal owner and beneficiary, but now did so on behalf of AIG.

34.    In 2017, FCI Ireland acquired the beneficial interest in the Policy from AIG. U.S. Bank continued to serve as the Policy's legal owner and beneficiary, but now did so on behalf of FCI Ireland.

35.    Later that year, FCI Ireland and Berkshire Hathaway jointly formed and funded FCI SPV-B for the purpose of acquiring and investing in the beneficial interests in life insurance policies procured without a valid insurable interest. FCI Manager acted as investment manager for, and operated, FCI SPV-B.

36.    After its formation, FCI SPV-B acquired a beneficial interest in the Policy from FCI Ireland. Like its predecessors FCI Ireland and AIG, FCI SPV-B did not acquire, or purport to acquire, legal title to the Policy. Thus, FCI SPV-B was never listed in Hartford's records as the owner of the Policy, nor did it ever become the Policy's beneficiary of record—that is, the party with the right to claim and receive the death benefit from Hartford pursuant to the insurance contract. Instead, by virtue of the July 31, 2017 Securities Account Agreement and the November 13, 2017 Omnibus Assignment, Assumption, and Release Agreement, U.S. Bank was to serve in those capacities on FCI SPV-B's behalf (and, indirectly, on Berkshire Hathaway's behalf), just as U.S. Bank had previously done on behalf of FCI Ireland and AIG.

37.    More particularly, the Securities Account Agreement recognized that, as the Policy's beneficiary, U.S. Bank had the sole right to claim and receive the Policy's death benefit from

Hartford; contemplated that U.S. Bank would "receive" the "death benefits under" the Policy; and required U.S. Bank to transfer those death benefits to FCI SPV-B within one to three business days after U.S. Bank's "receipt" of those death benefits.

38.     As a joint owner of FCI SPV-B, Berkshire Hathaway also had a beneficial interest in the Policy and in its proceeds. It held that beneficial interest through its partial ownership of FCI SPV-B.

39.     On August 24, 2024, Mr. Pechter died.

40.     On or about September 6, 2024, U.S. Bank submitted to Hartford a claim for the Policy's death benefit. In the paperwork submitted in support of its claim, U.S. Bank described itself as the "Policy Owner" and as "Beneficiary – Person named to receive funds from the policy." It did not mention FCI SPV-B or Berkshire Hathaway.

41.     Because U.S. Bank was the Policy's beneficiary, and thus had the sole right to claim and receive the Policy's death benefit, Hartford accepted the claim and accordingly paid the Policy's death benefit to U.S. Bank in the amount of $12,516,438.36 (representing the Policy's face amount of $12,500,000.00 plus accrued interest of $16,438.36). U.S. Bank received those benefits on or about September 17, 2024, and, as is likely to have evidentiary support after a reasonable opportunity for discovery or further investigation, sent FCI SPV-B a notification stating: "Net Death Benefit received from carrier." U.S. Bank subsequently transferred that amount to FCI SPV-B. As is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, Berkshire Hathaway received a portion of the proceeds.

11

## COUNT I — RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST

### AGAINST U.S. BANK, FCI SPV-B, AND BERKSHIRE HATHAWAY

42.     The Policy was applied for, and the application was signed, in Delaware by the Trust, a Delaware statutory trust formed under Delaware law and having a Delaware-based trustee, as the Policy's prospective owner and beneficiary. The Policy was then issued for delivery to and was actually delivered to the trustee of the Trust, Wilmington Trust, with its principal place of business in Wilmington, Delaware. For these and/or other reasons, the Policy is governed by Delaware law. 18 *Del. C.* § 2704(e)(4), (g).

43.     The Policy was procured, originated, and funded by third-party investors from the outset. These third-party investors paid all the premiums. Mr. Pechter never paid any premiums, nor was he responsible for paying any premiums or for repaying the loan. The Policy lacked an insurable interest because it was procured, or was caused to be procured, by third-party strangers without an insurable interest. For separate and independent reasons, the Policy lacked an insurable interest because it was not effected in good faith or for a lawful insurance purpose but instead was a cover for a wager, and because the Trust to which the Policy was initially issued was a sham and was nominally funded. In all events, the Policy lacked an insurable interest under Delaware law.

44.     Where an insurance company pays the death benefit on a policy lacking an insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or other payee that received the benefits as a matter of 18 *Del. C.* § 2704(b). *See Wells Fargo Bank, N.A. and Berkshire Hathaway Life Insurance Company of Nebraska v. Estate of Malkin*, 278 A.3d 53, 61 (Del. 2022) ("By providing that an estate 'may maintain an action' to recover death benefits, Section 2704(b) confers standing on the estate and codifies the longstanding

common-law rule that, if the insurer pays the death benefit on a policy that lacks an insurable interest, the estate may sue to receive that benefit.") (footnote calls omitted) ("*Malkin*").

45.     The Policy's death benefit was paid to and received by U.S. Bank, FCI SPV-B, and Berkshire Hathaway.

46.     As a consequence, the Estate is entitled to recover the amount of that death benefit, plus applicable interest, from U.S. Bank, FCI SPV-B, and Berkshire Hathaway, jointly and severally.

## COUNT II — CIVIL CONSPIRACY TO WAGER ON HUMAN LIFE

### AGAINST FCI MANAGER AND, IN THE ALTERNATIVE, AGAINST BERKSHIRE HATHAWAY AND U.S. BANK

47.     The Estate hereby incorporates by reference the foregoing allegations.

48.     The purpose of the Delaware-based STOLI conspiracy described above was, among other things, to procure an illegal wager on the life of Mr. Pechter through the Coventry program in violation of 18 *Del. C.* § 2704; to perpetuate the Policy until Mr. Pechter's death; and to collect the Policy's proceeds upon Mr. Pechter's death. These acts were all contrary to Delaware law. *See Malkin*, 278 A.3d at 65 n.48 ("STOLI arrangements are unique in that they are not simply void *ab initio*, anathema to hundreds of years of public policy, or violative of the Delaware Constitution, but they boast all three of these unenviable qualities."); *id*. at 65 ("[B]ecause STOLI policies are void *ab initio*, when an investor receives their proceeds it … commit[s] … a violation of Article II, Section 17 of Delaware['s] Constitution and of the State's public policy.").

49.     In its capacity as FCI SPV-B's investment manager, FCI Manager participated in this conspiracy by, *inter alia*, advising FCI SPV-B to purchase the beneficial interest in the Policy and by facilitating that transaction; by advising FCI SPV-B to pay the Policy's premiums and to keep the Policy in effect until Mr. Pechter's death, and by facilitating those efforts; and by directing or

overseeing U.S. Bank in claiming and collecting the Policy's death benefit and in subsequently transferring the death benefit to FCI SPV-B.

50.     U.S. Bank participated in the conspiracy by, *inter alia*, acting, on FCI SPV-B's behalf and at the direction of FCI SPV-B or its agents, as the Policy's beneficiary and owner; by paying the Policy's premiums with funds provided by FCI SPV-B; by claiming and receiving the Policy's death benefit; and by transferring the death benefit to FCI SPV-B.

51.     Berkshire Hathaway participated in the conspiracy by joining with FCI Ireland to form FCI SPV-B for the purpose of engaging in unlawful wagers on human life, including the wager on Mr. Pechter's life, and by contributing funds to FCI SPV-B for the purpose of acquiring the Policy and keeping it in force.

52.     As is likely to have evidentiary support after a reasonable opportunity for discovery or further investigation, the conspiracy continued even after the Policy's proceeds were collected: with the assistance of U.S. Bank and FCI Manager, FCI SPV-B retained the Policy's illegal proceeds, subsequently paid them to downstream investors, including Berkshire Hathaway, and continued to conceal FCI SPV-B's ownership interest and its role in the STOLI scheme. These acts prevented the Estate from discovering the conspiracy and from asserting its rights, and they furthered the conspiracy's central objective: to profit from an unlawful wager on Mr. Pechter's life while avoiding detection and accountability.

53.     U.S. Bank's, FCI Manager's, and Berkshire Hathaway's conduct was intentional, coordinated, and undertaken with knowledge that the Policy and the acts in furtherance of the conspiracy violated Delaware law. The Delaware Supreme Court has described similar STOLI arrangements as a "fraud upon the court." *Malkin*, 278 A.3d at 56. Under 18 *Del. C.* § 2704(a), any policy procured without a valid insurable interest is void *ab initio*, and, as the Delaware Supreme

14

Court held in *Malkin*, a STOLI policyholder's receipt of STOLI proceeds violates Delaware's Constitution and public policy. *Id*. at 65.

54.     As a direct and proximate result of the conspiracy, Mr. Pechter and his Estate suffered damages. Among other things, the unlawful STOLI scheme constituted a wager on Mr. Pechter's life, allowing strangers with no insurable interest to profit from his death, and thereby also causing dignitary and emotional harm by turning Mr. Pechter into an instrument for their bet on his life. U.S. Bank, FCI Manager, and Berkshire Hathaway also intruded upon Mr. Pechter's privacy by using servicers to contact him and his family regarding his health to determine whether he was still alive, and misusing his private medical information to obtain life expectancy reports to determine whether he was likely to die soon enough to make a bet on his life profitable. The Estate has also suffered and continues to suffer monetary harm because, as a result of the conspiracy, FCI SPV-B is wrongfully retaining the amount of the Policy's illegal proceeds, to which the Estate is entitled under 18 *Del. C.* § 2704(b).

### COUNT III — AIDING AND ABETTING A WAGER ON HUMAN LIFE

### AGAINST FCI MANAGER AND, IN THE ALTERNATIVE, AGAINST BERKSHIRE HATHAWAY AND U.S. BANK

55.     The Estate hereby incorporates by reference the foregoing allegations.

56.     When FCI SPV-B acquired the beneficial interest in the Policy, perpetuated the Policy by paying its premiums, and received its proceeds, its investment manager and operator, FCI Manager, its agent, U.S. Bank, and its co-founder, Berkshire Hathaway, knew that the Policy was an illegal STOLI policy in violation of Delaware law, and that those acts were therefore illegal under Delaware law.

15

57.     Nonetheless, as described above, FCI Manager advised FCI SPV-B to engage in the foregoing acts, and FCI Manager, U.S. Bank, and Berkshire Hathaway substantially assisted in and facilitated FCI SPV-B's commission of those acts.

58.     As a direct and proximate result of FCI SPV-B's actions and of FCI Manager's, U.S. Bank's, and Berkshire Hathaway's substantial assistance, Mr. Pechter and his Estate suffered damages, as set forth above.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, the Estate respectfully requests that this Court enter judgment against Defendants in an amount equal to the Policy's death benefit, *i.e.*, $12,516,438.36, plus prejudgment interest at Delaware's legal rate under 6 *Del. C.* § 2301(a) running from September 17, 2024, compounded quarterly; and that the Court grant such other monetary or equitable relief as the Court deems just and proper.

Dated: June 8, 2026

Respectfully submitted,

**COZEN O'CONNOR**

 */s/ Matthew L. Elkin*
Matthew L. Elkin
3 WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
(212) 509-9400
melkin@cozen.com

Gregory J. Star (*PHV* application forthcoming)
Matthew Bleich (*PHV* application forthcoming)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000

*Counsel for Plaintiff, Estate of Jack Pechter*